**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| MICHAEL C. DONATELLO, derivatively on behalf of COMSCORE, INC., | : | Civil Action No. |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | VERIFIED SHAREHOLDER DERIVATIVE |
| v. | : | COMPLAINT FOR VIOLATIONS OF THE |
| | : | FEDERAL SECURITIES LAWS AND |
| | : | STATE LAW CLAIMS FOR BREACHES OF |
| | : | FIDUCIARY DUTIES AND UNJUST |
| GIAN M. FULGONI, WILLIAM P. | : | ENRICHMENT |
| LIVEK, SERGE MATTA, MAGID M. | : | |
| ABRAHAM, DAVID I. CHEMEROW, | : | |
| MELVIN F. WESLEY III, KENNETH J. | : | |
| TARPEY, WILLIAM J. HENDERSON, | : | |
| WILLIAM E. ENGEL, RUSSELL | : | |
| FRADIN, RONALD J. KORN, BRENT D. | : | |
| ROSENTHAL, JEFFREY GANEK, | : | |
| WILLIAM KATZ, JOAN M. LEWIS, and | : | |
| PATRICIA A. GOTTESMAN, | : | **JURY TRIAL DEMANDED** |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| COMSCORE, INC., | : | |
| | : | |
| Nominal Defendant. | : | |
| | : | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.      Plaintiff Michael C. Donatello ("Plaintiff"), by and through his undersigned

attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for

the benefit of nominal defendant comScore, Inc. ("comScore" or the "Company"), against

certain current and former members of its Board of Directors (the "Board") and executive

officers seeking to remedy defendants' violations of federal securities laws, breaches of fiduciary

duties, and unjust enrichment, from at least 2013 through the present (the "Relevant Period").

Plaintiff makes these allegations upon personal knowledge and the investigation of counsel,

which included, among other things, review and analysis of: a) public filings made by comScore

and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); b) press releases and other publications disseminated by certain of the defendants and other related non-parties; c) news articles, shareholder communications, and postings on comScore's website concerning the Company's public statements; and d) other publicly available information concerning comScore and the defendants. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.      Plaintiff, on behalf of nominal defendant comScore, contends that the Individual Defendants (defined herein) caused the Company to: (i) repeatedly overstate its publically-reported financial results in violation of Generally Accepted Accounting Principles ("GAAP"); (ii) operate without effective internal controls to guard against the issuance of false financial reporting; (iii) file false and misleading statements with the SEC; and (iv) permit certain of its current and former executives to profit from this misconduct.  As a result, the Company has been, and will most certainly continue to be, harmed.

3.      According to its public filings, comScore is a technology-driven company that measures what people do as they navigate the digital world across technology platforms and devices including smartphones, tablets, televisions, and desktop computers. The Company provides trusted, independent data, metrics, products and services to clients in the media, advertising, and marketing industries.  According to the Company's last published Annual Report on Form 10-K, filed with the SEC on February 20, 2015 (the "2014 10-K"), the Company provided service to approximately 2,550 customers worldwide.

4.     In 2013, the Individual Defendants (defined herein) caused the Company to improperly account for data-sharing agreements entered into between comScore and other companies that had no cash attached.  These "barter" agreements were valued at "fair-value estimates," which, in turn: (i) boosted comScore's reported earnings; (ii) concealed how and the extent to which Individual Defendants' use of nonmonetary transactions overstated the Company's reported revenues and earnings; and (iii) enabled certain defendant insiders, including Chief Executive Officer ("CEO"), Defendant Serge Matta ("Matta") and Chief Financial Officer ("CFO"), Defendant Melvin Wesley ("Wesley"), to line their pockets with proceeds from ill-gotten stock sales.  Importantly, Defendants Matta and Wesley were given multimillion-dollar stock grants by the Board based on comScore's surging stock price, which were divided into four blocks that vested or could be exercised at progressively higher share prices ranging from $48 to $60.

5.     Defendants Matta and Wesley ultimately received all of their performance-based restricted stock awards, which were granted by the Board, including those members then-serving on the Board's Compensation Committee, between March and August 2015.  During that period, comScore's stock rose following earnings announcements for the fourth quarter of 2014 and the first and second quarters of 2015.  Further, during that 9-month period, the Individual Defendants caused the Company to report revenue growth of 15% year over year.  In fact, as was later revealed, actual revenue growth for this period was only about 9% once the inaccurate nonmonetary revenue associated with the barter agreements were removed from the equation.

6.     While the market absorbed the Individual Defendants' misleading statements concerning the Company's revenue growth, causing the Company's stock to climb higher, Defendants Matta and Wesley, along with the other Insider Selling Defendants (defined herein),

cashed-in, reaping millions in illicit proceeds.  For instance, the restricted shares Defendant Matta received from the Compensation Committee were worth a total of $7.6 million on the days they vested.  He sold a total of $6.7 million worth of stock between March and August of 2015, not including shares sold to cover taxes, and all the while aware of material, negative information related to the Company's financial health and performance.

7.      In addition to the sheer size of the Insider Selling Defendants' stock sales, their timing and their connection to what amounted to be fictitious growth, renders them increasingly suspicious.  Notably, the Company's stock price received a particularly big boost from nonmonetary revenue in the weeks leading up to August 23, 2015, when the Insider Selling Defendants received the last block of shares meant to vest after the stock exceeded a 30-day average of $60.  Just a few weeks before, the Individual Defendants caused comScore to report results for its second quarter in which revenue purportedly rose 14%.  On this news, the Company's stock hit a record $64.64 on August 17, 2015, clearing the bar—based on the Individual Defendants' own average share price calculation—for the Insider Selling Defendants' grants to vest.

8.      After the Insider Selling Defendants unloaded their stocks, and seemingly out of nowhere, on March 7, 2016, the Individual Defendants caused the Company to announce that it would be unable to submit its annual securities filing because its Audit Committee and independent counsel were conducting an internal review of its accounting.

9.      Then, on May 11, 2016, the Individual Defendants caused the Company to announce that it would not be able to submit its quarterly filing.  Just over a month later, on June 27, 2016, the Individual Defendants caused comScore to miss its own deadline to provide investors with an update on the investigation.

10.     By August 10, 2016, the Individual Defendants named a new management team. Defendant Matta, who was replaced as CEO with co-founder Defendant Gian Fulgoni ("Fulgoni"), was named executive vice chairman and adviser to Defendant Fulgoni, following the stepping-down of Defendant Magid Abraham ("Abraham") as executive chairman.

11.     Further, the Individual Defendants caused the Company to announce that the Audit Committee's investigation was "substantially complete," and that comScore's Audit Committee had identified "certain areas of potential concern, including with respect to certain accounting and disclosure practices and controls that the company…is further analyzing."

12.     Then, on September 15, 2016—unable to continue to ignore the issues, yet refusing to fully detail the extent of the misconduct—the Individual Defendants caused the Company to file with the SEC an announcement blaming "errors in judgment" for improperly accounting revenue over the years.  Accordingly, defendants caused the Company to announce its need to restate its financial results for 2013, 2014, and 2015.  The anticipated changes required the Individual Defendants to ***reduce the Company's reported revenues by a total of $48.5 million***.  More specifically, rather than the 12.1% growth implied by the Company's previously reported figures, comScore's revenue in 2015 only grew 8.6%.  Similarly, for 2014, the old and new figures were 14.7% and 10.3%, respectively.

13.     For comScore in particular, downgrading revenue was material.  The Individual Defendants often emphasized the importance of comScore's reported revenues and EBITDA in its filings with the SEC during the Relevant Period.  For example, in its Form 14A Annual Proxy filed with the SEC on June 8, 2015, the Individual Defendants caused comScore to describe revenue and adjusted EBITDA as the "***key financial measures by which our stockholders evaluate our progress***." (Emphasis added).  Thus, the Individual Defendants wanted analysts and

investors to consider revenue one of the most important metrics to evaluate the Company. In turn, and because the Company had not reported an annual profit for years, the market rewarded comScore's purported growth evidenced best by the Company's increasing stock price. Unsurprisingly, the news that reported revenues were to be reduced by tens of millions of dollars shocked the market.

14.     In addition, according to the September 15, 2016 release, the Board's investigation concluded that revenue and expenses for the nonmonetary agreements involving swapping data with other companies should not have been recognized. Moreover, the Audit Committee "concluded that these transactions have been recorded in error" in comScore's accounting practices. The Audit Committee blamed "internal control deficiencies," and acknowledged that potentially material, accounting adjustments may be necessary if these deficiencies extended to transactions beyond the scope of the investigation.

15.     The media took note. On September 16, 2016, for example, *The Wall Street Journal* ("*WSJ*") published an article entitled, "Growth and Trust Are Scarce at ComScore," which reported how the Board, "though they may not have orchestrated the nonmonetary revenue scheme, should have been aware of it and its effect on compensation."

16.     Then, on November 23, 2016, the Individual Defendants caused comScore to file a report with the SEC announcing the conclusion of the Audit Committee's investigation, which purportedly uncovered that certain monetary transactions and contracts were not properly accounted for, and that "as a result of that review, there may be additional accounting adjustments and such adjustments may be material." The Individual Defendants also caused the Company to announce the resignation of two of its directors, including then-Chair Defendant Joan Lewis ("Lewis") and Defendant Patricia Gottesman ("Gottesman").

17.    By February 6, 2017, the Individual Defendants caused the Company to update the market on the Company's inability to meet a February 23, 2017 deadline, set by NASDAQ's Hearings Panel, for comScore to regain compliance with its reporting requirements.  On this news, comScore's stock nosedived 21.9%.

18.    *The WSJ* published an article soon thereafter suggesting that the Company's inability to meet a deadline for overdue financial disclosures "suggests problems run deeper than previously thought."  In relevant part, the *WSJ* reported:

> ***For a company entrusted with providing accurate data on internet audiences, comScore is having a remarkably difficult time accurately measuring itself.***
>
> The firm said Monday it faced possible delisting from Nasdaq because it couldn't file its overdue financial disclosures in time.  ComScore said Sept. 15 it would restate financial results from 2013, 2014, 2015 after an internal investigation discovered problems with its accounting.
>
> The Company also hasn't submitted it annual securities filing for 2015 or any of its quarterly filings for 2016.  Nasdaq had given it until Feb. 23 to complete the restatements.  ComScore shares were down about 25% at midday.
>
> *               *               *
>
> ***The additional delay in filing the restatements suggests the problems run deeper than previously thought and may lead wary customers to look elsewhere for measurement data***.

(Emphasis added).

19.    By February 10, 2017, comScore shares were delisted from NASDAQ and moved to over-the-counter trading.

20.    Accordingly, as a result of the Individual Defendants' misconduct, as set forth herein, the Company has been damaged, giving rise to Plaintiff's reasonable suspicion that one or more Company fiduciaries breached their duties owed to the Company and/or engaged in other violations of law.

21.     ComScore's Board currently consists of seven (7) directors, all of whom cannot consider a demand to commence litigation against themselves on behalf of the Company without the requisite level of disinterestedness and independence.  Accordingly, issuing a demand on the present Board to institute this action would be a futile, wasteful and useless act.

22.     Thus, this shareholder derivative action should be allowed to proceed.

## JURISDICTION AND VENUE

23.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5), promulgated thereunder, and under state law for breaches of fiduciary duties and unjust enrichment.   In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

24.     This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act (15 U.S.C. §78aa), as well as 28 U.S.C. §1331.  This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

25.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

26.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa), as well as 28 U.S.C. §1391(b).   Many of the acts alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.   The Company, as nominal defendant, and certain of the Individual Defendants also conduct business in this District.  The Company maintains significant operations in New York City at both its 7 Penn Plaza and its 352 Park Avenue South locations.  Prior to being delisted for failing to meet reporting requirements, the Company's common stock

was listed and traded on the NASDAQ, which is located in this District and the Individual Defendants conducted various investor conferences in New York City to communicate with comScore investors during the Relevant Period.

## PARTIES

27.     Plaintiff is a current shareholder of comScore and has continuously held comScore common stock since 2007.

28.     Nominal party comScore is a Delaware corporation that came to market through an initial public offering in 2007.  Since then, comScore completed targeted acquisitions of several businesses with complimentary research and analytics capabilities and established presences in Europe and Latin America so as to expand the Company's global footprint.

29.     Defendant Fulgoni co-founded comScore in 1999, has served on its Board since its founding, and has served as the Company's CEO since September 2016.  Before serving as CEO, Defendant Fulgoni served as Executive Chairman of the Board from 1999 until March 2014, and as Chairman Emeritus from March 2014 until August 2016.  comScore's 2015 Annual Proxy statement to shareholders concedes that Defendant Fulgoni lacked independence from the other Board members due to his positions at the Company and his relationships with its management.  Moreover, Defendant Fulgoni serves as a director of Dynamic Signal, Inc. ("Dynamic Signal"), a social media marketing technology company for which Defendant Fradin (defined below) serves as chairman of the board of directors and CEO.  Defendant Fulgoni also sits on the board of Petmed Express, Inc. ("Petmed") with Defendant Korn (defined below), both of whom sit on the audit, compensation and corporate governance committees together.  Finally, during the Relevant Period, while in possession of material nonpublic inside information about

comScore, and while the Company's securities traded at artificially inflated prices, Defendant Fulgoni sold $6.2 million of his personally-held comScore stock.

30.    Defendant Bill Livek ("Livek") has served as a member of the Board since comScore acquired Rentrak in February 2016, and has served as the Executive Vice Chairman and President of comScore since August 2016.  Critically, while Defendant Livek served as a director of Rentrak and as Rentrak's CEO prior to comScore's acquisition by Rentrak, the then-serving Rentrak board conceded that he lacked independence from the other Rentrak board members.

31.    Defendant Matta served as comScore's CEO from March 1, 2014 until August 5, 2016, after joining the Company in 2000.  Defendant Matta ended his employment with comScore on October 10, 2016 and resigned from the Board on December 15, 2016.  During the Relevant Period, while in possession of material non-public information about comScore, and while the Company's securities traded at artificially inflated prices, Defendant Matta sold $10.6 million of his personally-held comScore stock.

32.    Defendant Abraham co-founded comScore in 1999 and was, from the Company's inception until March 1, 2014, comScore's CEO, and, from March 1, 2014 until July 21, 2016, the Executive Chairman of the Board.  On December 5, 2016, the Company announced that Defendant Abraham resigned from the Board effective immediately.  During the Relevant Period, while in possession of material non-public information about comScore, and while the Company's securities traded at artificially inflated prices, Defendant Abraham sold $29.9 million of his personally-held comScore stock.

33.     Defendant David I. Chemerow ("Chemerow") has served as comScore's CFO since August 5, 2016.   Previously, prior to comScore's acquisition of Rentrak, Defendant Chemerow served as Rentrak's Chief Operating Officer, CFO, and Secretary.

34.     Defendant Wesley served, from August 29, 2014 until August 5, 2016, as comScore's CFO.  On October 10, 2016, Defendant Wesley formally ended his relationship with the Company. During the Relevant Period, while in possession of material non-public information about comScore, and while the Company's securities traded at artificially inflated prices, Defendant Wesley sold $6.2 million of his personally-held comScore stock.

35.     Defendant Kenneth J. Tarpey ("Tarpey") served, from April 20, 2009 until August 5, 2014, as comScore's CFO.   During the Relevant Period, while in possession of material non-public information about comScore, and while the Company's securities traded at artificially inflated prices, Defendant Tarpey sold $1 million of his personally-held comScore stock.

36.     Defendant William E. Engel ("Engel") has served as a director since February 2016, joining the Board following comScore's acquisition of Rentrak where Defendant Engel had previously served in a directorship role.

37.     Defendant Russel Fradin ("Fradin") has served as a director of comScore since July 2014.   Previously, Defendant Fradin served as comScore's Executive Vice President, Corporate Development from June 2000 to June 2004.   As previously mentioned, Defendant Fradin serves as the Chairman of the Board and as CEO of Dynamic Signal, where Defendant Fulgoni serves on the board.  As a member of the Company's Compensation Committee during 2014-2016, Defendant Fradin controlled the executive compensation of the then-present Officer Defendants.

38.     Defendant William J. Henderson ("Henderson"), who served as a member of the Board, Chair of its Compensation Committee and its Lead Independent Director throughout the Relevant Period, was recently named the Chairman of the Board on November 18, 2016. Concurrently, Defendant Henderson serves on the board of directors of Acxiom, an enterprise data, analytics and software-as-a-service company, and has since June 2001.  As a member of the Acxiom board, Defendant Henderson serves as chairman of the compensation committee and as a member of its corporate governance committee.  As a member of comScore's Compensation Committee, Defendant Henderson controlled the other Defendants' executive compensation.  As a member of the Audit Committee, Defendant Henderson caused or allowed the dissemination of the improper public statements described herein.  During the Relevant Period, while in possession of material non-public information about comScore, and while the Company's securities traded at artificially inflated prices, Defendant Henderson sold $1.4 million of his personally-held comScore stock.

39.     Defendant Ronald J. Korn ("Korn") is a director of comScore.  He also sits on the Petmed board of directors with Defendant Fulgoni.  Together, they both sit on the audit, compensation and corporate governance committees.  As a member of comScore's Audit Committee in 2013 and 2015, and as Chair in 2016, Defendant Korn caused or allowed the dissemination of the improper public statements described herein.  During the Relevant Period, while in possession of material non-public information about comScore, and while the Company's securities traded at artificially inflated prices, Defendant Korn sold $205,800 of his personally-held comScore stock.

40.     Defendant Brent D. Rosenthal ("Rosenthal") has served as a director of comScore since February 2016 when comScore acquired Rentrak where Defendant Rosenthal had served as

a director.  As a member of the Audit Committee during 2016, Defendant Rosenthal caused or allowed the dissemination of the improper public statements described herein.

41.     Defendant Jeffrey Ganek ("Ganek") served as a director of comScore between 2008 and 2014.  As a member of the Audit Committee during 2013-2014, Defendant Ganek caused or allowed the dissemination of the improper public statements described herein.

42.     Defendant William Katz ("Katz") served as a director of comScore during the Relevant Period until he resigned in September 2016.  As a member of the Compensation Committee, Defendant Katz controlled the executive compensation of the then-serving Officer Defendants.

43.     Defendant Lewis served as a director of comScore between January 2015 and November 2016.  Defendant Lewis also served as the Chairman of the Board between July 2016 and November 2016.  As a member of the Audit Committee during 2015-2016, Defendant Lewis caused or allowed the dissemination of the improper public statements described herein.

44.     Defendant Gottesman served as a director of comScore between February 2016, following comScore's acquisition of Rentrak, and her resignation in November 2016.  Previously Defendant Gottesman had served as a director of Rentrak.

45.     Collectively, Defendants Fulgoni, Livek,  Matta,  Abraham, Chemerow, Wesley, Tarpey, Henderson, Engel, Fradin, Korn, Rosenthal, Ganek, Katz, Lewis, and Gottesman are referred to herein as the "Individual Defendants."

46.     Collectively, Defendants Fulgoni, Livek, Engel, Fradin, Henderson, Korn, and Rosenthal are referred to herein as the "Director Defendants."

47.     Collectively, Defendants Fulgoni, Livek, Matta, Abraham, Chemerow, Wesley and Tarpey are referred to herein as the "Officer Defendants."

48.     Collectively, Defendants Fulgoni, Matta, Abraham, Wesley, Tarpey, Henderson, and Korn are referred to herein as the "Insider Selling Defendants."

### THE INDIVIDUAL DEFENDANTS' DUTIES

49.     By reason of their positions as officers, directors, and/or fiduciaries of ComScore, and because of their ability to control the business and corporate affairs of ComScore, the Individual Defendants owed comScore and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage comScore in a fair, just, honest, and equitable manner.

50.     Further, the Individual Defendants were and are required to act in furtherance of the best interests of comScore and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest and benefit.   Each director and officer of the Company owes to comScore and its shareholders the fiduciary duty to exercise good faith and due diligence in the administration of the affairs of the Company, and in the use and preservation of its property and assets, as well as the highest obligation of fair dealing.

51.     Because of their positions of control and authority as directors and/or officers of comScore, having knowledge of material non-public information regarding the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   To discharge their duties, the officers and directors of comScore were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties the officers and directors of comScore were required to, among other things:

  a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.      Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

c.      Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results; and

d.      When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

52.    Pursuant to the Audit Committee's Charter, all members of the Audit Committee throughout the Relevant Period, including Defendants Korn, Henderson and Rosenthal, were responsible for, among other things:

*Oversee[ing] the accounting and financial reporting processes of the Company and audits of the financial statements of the Company*; [and]

Assist[ing] the Board in oversight and monitoring of (i) *the integrity of the Company's financial statement*s; (ii) *the Company's compliance with legal and regulatory requirements*; (iii) the independent auditor's qualifications, independence and performance; (iv) the Company's internal accounting and financial contract; and (v) the performance of the Company's internal audit function.

(Emphasis added).

53.    Moreover, each member of the Audit Committee was also responsible for:

*Reviewing on a continuing basis the adequacy of the Company's system of internal controls*, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings...;

*       *       *

Reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

*       *       *

***Reviewing, before release the unaudited quarterly operating results in the Company's quarterly earnings release***; [and]

*       *       *

Reviewing, approving and monitoring the Company's code of ethics for its senior financial officers.

(Emphasis added).

54.    Similarly, each member of the Board's Compensation Committee throughout the Relevant Period, including Defendants Henderson and Fradin, were and are responsible for discharging the Board's responsibilities relating to oversight of the compensation of the Company's CEO and other executive officers.  The Compensation Committee has overall responsibility for approving and evaluating the executive officer and non-executive level employee compensation plans, policies and programs of the Company ***and for administering the Company's equity compensation plans***.  (Emphasis added).  Further:

Unless otherwise determined by a majority of the independent directors of the Board meeting in executive session, the Compensation Committee reviews and recommends to the Board specific objectives of the Company's compensation plans, policies and programs and annually reviews and approves ***all compensation and benefit plans for the Chief Executive Officer ("CEO") and the other executive officers of the Company including, without limitation, (a) the annual base salary, (b) the annual incentive bonus, including the specific goals and amount, (c) equity compensation***, (d) employment agreements, severance arrangements, and change in control agreements/ provisions and (e) any other benefits, compensation, perquisites or arrangements, in light of those specific objectives. Equity compensation arrangements involving executive officers that are "reporting persons" for purposes of Section 16 of the Exchange Act shall be reviewed and approved by the Compensation Committee to ensure

compliance with SEC Rule 16b-3. In determining the compensation and benefits of the CEO, the CEO may not be present during deliberations or voting on such matters.

(Emphasis added).

55.    The Board has also adopted a Code of Business Conduct and Ethics (the "Ethics Code") that must be acknowledged and adhered to by every employee, including officers, directors and all employees of subsidiaries worldwide, agent or contractor.    Among the many requirements, the Ethics Code expressly states:

COMPLIANCE WITH THE LAW

***You are required for complying with all laws, rules, regulations and regulatory orders applicable to the conduct of our business***.

*            *            *

PUBLIC COMMUNICATIONS

Depending upon your position with the company, you may be called upon to provide information to help assure that the company's public reports and communications are ***complete, fair, accurate and understandable***. You are ***expected to use all reasonable efforts to provide complete, accurate, objective, relevant, timely and understandable*** answers to inquiries related to the company's public disclosures. Individuals involved in the preparation of public reports and communications must use all reasonable efforts to comply with our disclosure controls and procedures, which are designed to ensure ***full, fair, accurate, timely and understandable disclosure*** in our public reports and communications.

***If you believe that any disclosure is materially misleading or if you become aware of any material information that you believe should be disclosed to the public, it is your responsibility to bring this information to the attention of the Company's General Counsel[.]  If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should notify the Audit Committee of the Board of Directors.***

*            *            *

FINANCIAL REPORTING

***As a public company, we are required to follow strict accounting principles and standards,  to report financial information accurately and completely in***

*accordance with these principles and standards, and to have appropriate internal controls and procedures to ensure that our accounting and financial reporting complies with law.* The integrity of our financial transactions and records is critical to the operation of our business and is a key factor in maintaining the confidence and trust of our employees, security holders and other stakeholders.

*      *      *

It is important that those who rely on records and reports—managers and other decision makers, creditors, customers and auditors—have *complete, accurate and timely information*. *False, misleading or incomplete information undermines the company's ability to make good decisions about resources, employees and programs and may, in some cases, result in violations of law*. *Anyone involved in preparing financial or accounting records or reports, including financial statements and schedules, must be diligent in assuring that those records and reports are complete, accurate and timely.* Anyone representing or certifying as to the accuracy of such records and reports should make an inquiry or review adequate to establish a good faith belief in their accuracy.

*      *      *

*You may not intentionally misrepresent the company's financial performance or otherwise intentionally compromise the integrity of the company's reports, records, policies and procedures.*

(Emphasis added).

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

56.    According to its public filings, comScore provides trusted, independent data, metrics, products and services to clients in the media, advertising, and marketing industries.  The Company's digital media analytics helps content owners and advertisers understand—and thus properly value—the composition of consumer media audiences, and helps marketers understand the performance and effectiveness of advertising targeted at these audiences.

57.     ComScore was founded in July 1999 by Defendants Fulgoni and Abraham. Following its founding, comScore grew through acquisitions, acquiring several large customer bases helping to accelerate the growth of comScore's syndicated measurement service.

58.     The Company eventually went public in 2007, listing its shares on the NASDAQ.

59.     On February 11, 2014, comScore announced the appointment of Defendant Matta as its CEO, and on August 5, 2014 it announced the appointment of Defendant Wesley as its CFO.

60.     In September 2015, comScore announced that it would acquire Rentrak, a global media measurement and research company serving the entertainment industry (the "Rentrak Acquisition").   The Individual Defendants touted the benefits of the Rentrak Acquisition, drawing particular attention to the value of combining comScore's digital media measurement capabilities with Rentrak's television measurement capabilities to create an even more massive cross-platform media measurement firm.   Reportedly, the goal was to challenge Nielsen Holding PLC.   Under the terms of the Rentrak Acquisition, which closed on February 1, 2016, comScore acquired Rentrak in an all-stock deal valued at approximately $732 million and Rentrak shareholders received 1.15 shares of comScore for each share of Rentrak owned.

61.     According to a complaint filed in a case pending in the Circuit Court of the State of Oregon, captioned *In re Rentrak Corp. Shareholder Litigation*, 15-cv-27429, Rentrak retained Grant Thornton LLP ("Grant Thornton") to perform financial due diligence on comScore in connection with conducting its due diligence as part of the Rentrak Acquisition.   According to the complaint in that case, Grant Thornton provided Rentrak's board of directors, which then included Defendants Livek, Engel and Rosenthal, a report dated September 4, 2015 that raised several red flags regarding comScore's recognition of nonmonetary revenue.   Among Grant

Thornton's key findings, particularly relevant here, were its concerns that comScore's use of nonmonetary transactions for the sharing of data or exchanging of services, which had been accounted for as revenue, "may have provided opportunities for [comScore] Management to 'manage' revenues to meet targets[,]" and/or "may not be fully understood by research analysts and [investors.]"  In addition, Grant Thornton questioned just "how much [the Company's] stock price may be impacted if [these] non-monetary arrangements are better understood[,]" and whether, or to what degree, "analysts have incorporated [the nonmonetary arrangements] in their forecasts and [how much they] understand the arrangement's impact on revenue and earnings."

### B.    The Individual Defendants Issued False and Misleading Statements About the Company's Financial Performance, Causing comScore's Stock to Trade at Artificially Inflated Prices

62.    Starting at least in 2013, the Individual Defendants undertook an effort to artificially pump up the Company's reported revenues by including not only cash revenue from paying customers, but also revenue purportedly linked to nonmonetary transactions.  These nonmonetary transactions related to data-sharing agreements where comScore would swap data without exchanging any significant cash or other payment with counterparties who, in turn, booked no revenue from these data exchange deals.  Nevertheless, the Individual Defendants caused comScore to book tens of millions of dollars in revenue based on their own "fair value" determination of the nonmonetary transactions.

63.    Supposedly, according to the Company's filings with the SEC during the Relevant Period, this "fair value" determination was in compliance with GAAP section ASC 845, which governs revenue recognition when an issuer does not receive a payment of cash or other monetary assets or liabilities for goods or services.  Specifically, the Individual Defendants caused the Company to assure the SEC and the market that:

The Company accounts for nonmonetary transactions under ASC 845, Nonmonetary Transactions. Nonmonetary transactions with commercial substance are recorded at the estimated fair value of assets surrendered including cash, if cash is less than 25% of the fair value of the overall exchange, unless the fair value of the assets received is more clearly evident, in which case the fair value of the asset received is used.

64.     The Individual Defendants' decision to quantify nonmonetary transactions at their purported "fair value," and include them in the Company's reported revenue, caused comScore to appear financially strong. It also enabled the Individual Defendants to hang the Company's growth—albeit fictitious—to a key, reportable metric, which, in turn, could be and was used to report "record" performance quarter after quarter. In fact, in each of comScore's press releases announcing its financial results during the Relevant Period, the very first metrics mentioned were the Company's revenue, revenue growth, EBITDA, and EBITDA growth, followed by an announcement that comScore's revenue for the particular period was a new "record." Similarly, Defendants Abraham, Tarpey, Matta and Wesley spoke about the Company's revenue and revenue growth on each investor conference call held during the Relevant Period.

65.     Noticeably, during the Relevant Period, the Individual Defendants rarely, if at all, separated comScore's nonmonetary revenue from its monetary revenue in Company press releases or during discussions with analysts or investors on the Company's investor conference calls. Instead, the Individual Defendants discussed revenue and revenue growth as a whole. This, however, was not the case in the Company's SEC filings, which stated as follows:

- **FY December 31, 2013**: "Record" revenue equaled $286.9 million, which was comprised of $3.2 million in nonmonetary revenue;

- **January 31, 2014**: "Record" revenue equaled $76.9 million, which was comprised of $2.2 million in nonmonetary revenue;

- **June 30, 2014**: "Record" revenue equaled $80.0 million, which was comprised of $1.8 million in nonmonetary revenue;

- **September 30, 2014**: "Record" revenue equaled $82.1 million, which was comprised of $4.6 million in nonmonetary revenue;

- **3 Months December 31, 2014**: "Record" revenue equaled $90.1 million, which was comprised of $7.7 million in nonmonetary revenue;

- **FY December 31, 2014**: "Record" revenue equaled $329.1 million, which was comprised of $16.3 million in nonmonetary revenue;

- **January 31, 2015**: "Record" revenue equaled $87.3 million, which was comprised of $3.8 million in nonmonetary revenue; and

- **June 30, 2015**: "Record" revenue equaled $91.4 million, which was comprised of $10.8 million in nonmonetary revenue.

66.    Analysts absorbed this information, viewing the Company's current and prospective growth positively.  In a March 20, 2014 report, for example, Brean Capital LLC ("Brean Capital") noted that "[comScore's] revenue model is relatively predictable" and that the Company should be able to achieve "mid-teens revenue growth."  Moreover, on December 1, 2014, SunTrust Robinson Humphrey ("SunTrust") labeled comScore a "buy," noting, in particular, that:

> The [C]ompany is on the front-end of a multi-year multi-product cycle that should (at least through 2016) drive strong top-line [*i.e.,* revenue] growth (~16%) and margin expansion (EBITDA growth ~20%) with bottom-line further supported by buybacks….

67.    Similarly, on January 28, 2015, Wedbush Securities ("Wedbush") rated comScore "outperform," stating that "we believe comScore is an attractive investment opportunity … [w]e view comScore as a base-line mid-teens revenue grower (~16% for 2015/16) with faster EBITDA growth…."  And, on August 4, 2015, an analyst from Cantor Fitzgerald noted that comScore's "continued strength in subscription revenue growth, [and] improving margins" were keeping "us positive on the name."

68.    Then, on August 31, 2015, the *Wall Street Journal* published an article entitled, "Is comScore's Revenue Growth as Good as it Seems?" (the "August 31 *WSJ* Article"). The article questioned "what is driving [comScore's] growth" and noted, in particular, that a significant amount of comScore's revenue consisted of revenue derived from nonmonetary transactions, stating in relevant part, "comScore reported second quarter revenue of $91.4 million on Aug. 4, up 14% from a year earlier.  A note within its quarterly filing explained, though, that $10.8 million was 'nonmonetary' revenue."

69.    As the *WSJ* aptly noted, the Company's "nonmonetary revenue has ramped up significantly over the past 12 months.  It accounted for about 8% of comScore's total revenue over the period, versus only 2% in the previous 12 months.  ComScore's stock, meanwhile, reached a 52-week high earlier this month, closing at $64.64 on Aug. 17." The article also noted that "the [nonmonetary revenue] gains are based on estimates of the assets' fair value; ***that is subjective by nature*** and has been open to question in the past in other industries…." (Emphasis added).

70.    According to the August 31 *WSJ* Article, moreover, if this nonmonetary revenue had been excluded from comScore's income statement, comScore's revenue growth would have been significantly less quarter over quarter and year over year, as shown in the graph below:



71.     The August 31 *WSJ* Article continued: "comScore determined how much revenue to book based on the average historical cash sales of the same product.  That seems like an appropriate approach to fair-valuing the asset, but investors don't know much beyond that about the [C]ompany's method."  Noting that "much of the [C]ompany's reported top-line growth has come from revenue that brings no cash in the door," the *WSJ* concluded by advising "[i]nvestors cheering comScore's top-line growth [to] take closer note of where it is coming from."

72.     The Individual Defendants were quick to respond to the August 31 *WSJ* Article, assuring the market, which had reacted negatively to the story and caused comScore's stock to drop approximately 15% by September 2, 2015, that the Company was properly accounting for its nonmonetary revenue.  They also arranged meetings with key analysts covering the Company, including Brean Capital and Cantor Fitzgerald.

73.     In a September 3, 2015 report, Brean Capital acknowledged meeting with the Company to discuss its nonmonetary revenue, and, subsequently, reiterated its "buy" rating and $67 price target.  According to Brean Capital, management stated that it expected the level of revenue recognition to fall in 2016, which would weigh modestly on overall reported revenue growth, but that comScore would still meet its expected margin expansion.

74.     Similarly, in a September 24, 2015 report, Cantor Fitzgerald wrote that "[w]hile we're not big fans of barter transactions, we believe management has adequately addressed the logic behind pursuing them and their benefits to the business….We remain positive on [comScore] and maintain our BUY rating and $64 [target price]."

75.     On September 3, 2015, Defendants Matta and Wesley also participated in a conversation with institutional investors.  During that call, following a suggestion that comScore's accounting for nonmonetary transactions could possibly "overstate your revenue and

understate your expenses," Defendants Wesley and Matta insisted that the nonmonetary revenue was not overstated, was based on comparable cash sales, complied with GAAP, and that comScore followed the accounting rules explicitly. Defendants Wesley and Matta stated in relevant part:

> [Defendant Wesley:] Well, no. I think. No. I'm not sure how you are arriving at the fact that it over states your revenue. If we believe that we're basically getting more value because again, remember, *the value is based on our historic sales*. *The value that we record in revenue is consistent with our historic sales for the same products*.

> [Defendant Matta:] Let's just be very clear, *the revenue that we are taking on here is based on revenues that we have sold before of similar transaction for cash*. The revenue is calculated based on fair value. It is fully audited by our accounting firm E&Y, and it follows GAAP revenue. It is 100% GAAP revenue. It is audited by E&Y….[A]gain, if there is something that we have provided in these transactions that we have not ever sold for cash previously, we would not be able to take any revenue for that. So the guidelines are very, very strict and we follow them to the "t."

(Emphasis added).

76.    Nonetheless, Defendant Matta promised that the Company would avoid doing future barter deals and would improve its disclosures concerning the ones it had already recorded, stating that "the bottom line is on a going forward basis, we are going to work to avoid these transactions wherever possible…."

77.    In response to Defendants Wesley and Matta's false reassurances, analysts remained positive about comScore, recasting the Individual Defendants' assertions that comScore's accounting complied with GAAP.   In effect, they halted the slide of comScore's stock price and laid the groundwork for the Individual Defendants to once again claim "record" revenues in the Company's subsequent filings.

78.    Having assuaged the market's concerns, at least for the time being, the Individual Defendants caused the Company to report on:

- **September 30, 2015**: "Record" revenue of $92.4 million, which was comprised of $9.1 million in nonmonetary revenue;

- **3 Months December 31, 2015**: "Record" revenue of $97.7 million, however the Company did not disclose how much of it was comprised of nonmonetary revenue; and

- **FY December 31, 2015**: "Record" revenue of $368.8 million, but again the Company did not disclose how much of it was comprised of nonmonetary revenue.

79.    Throughout the Relevant Period, and generally speaking, the market reacted positively to comScore's purported "record" revenue and EBITDA results.  As the table below illustrates, but for Q2 2014, the market drove up the Company's stock price higher after each announcement:

| Period | Reported "Record" Revenue | Stock Price Increase |
|---|---|---|
| FY 2013 | $286.9 million | 5% |
| Q1 2014 | $76.9 million | 10% |
| Q2 2014 | $80.0 million | 0% |
| Q3 2014 | $82.1 million | 7% |
| FY 2014 | $329.1 million | 25% |
| Q1 2015 | $87.3 million | 15% |
| Q2 2015 | $91.4 million | 14% |
| Q3 2015 | $92.4 million | 5% |
| FY 2015 | $368.8 million | 5% |

80.    By August 2015, comScore's stock price had nearly doubled from the Relevant Period starting price of $30.97 per share, reaching a Relevant Period high of over $64 per share.

81.    As it would turn out, however, these "record" revenues, as described herein and as disclosed finally by the Company in the fall of 2016, were predicated on miscalculated "fair values" for its nonmonetary transactions and, in other instances, errors associated with certain of the Company's monetary transactions.  To remedy these issues, the Company ultimately revealed the need to restate numerous financial filings.

C.    **As comScore's Share Price Climbed in Response to its Reported—Albeit False—"Record" Revenue and EBITDA, Defendants Matta And Wesley Profited Handsomely From Their Unique Compensation Packages**

82.    On November 7, 2014, under the direction of Defendant Henderson in his role as chair of comScore's Compensation Committee, the Company granted Defendants Matta and Wesley awards of stock options and restricted stock units that could be exercised or vested if the average daily closing price of the Company's common stock during any 30 consecutive calendar-day period exceeded the following predetermined price targets: $48.00, $50.00, $55.00 or $60.00.  Importantly, when the awards were granted, the Company's stock was trading at approximately $43 per share.

83.    By August 2015, all four blocks of shares granted to Defendants Matta and Wesley qualified for vesting or exercising.  As illustrated by the table below, Defendants Matta and Wesley received shares valued, collectively, at more than $9 million, in a remarkably short period of time—*i.e.,* less than 6 months:

| Tier | Date Vested | Vested Shares Received by Defendant Matta | Value of Defendant Matta's Vested Shares | Vested Shares Received by Defendant Wesley | Value of Defendant Wesley's Vested Shares |
|------|-------------|-------------------------------------------|------------------------------------------|--------------------------------------------|-------------------------------------------|
| $48 | 3/1/2015 | 68,401 | $3,283,248 | 15,112 | $725,376 |
| $50 | 3/8/2015 | 13,686 | $684,300 | 3,148 | $157,400 |
| $55 | 6/6/2015 | 31,091 | $1,710,005 | 6,927 | $380,985 |
| $60 | 8/23/2015 | 28,500 | $1,710,000 | 6,297 | $377,820 |
| | | | Total: **$7,387,553** | Total: | **$1,641,581** |

84.    During this same time, and while the Company's shares were already trading at artificially inflated prices, the Board rolled out a series of aggressive stock-repurchase programs, which ensured that the Company's securities would remain high.  In the second quarter of 2015, which ended June 30, 2015, for example, the Individual Defendants caused comScore to spend $56.2 million of Company money to repurchase more than $1 million shares of Company stock

from the open market.  Similarly, in the third quarter of 2015, which ended September 30, 2015, comScore spent another $46 million to repurchase another approximately 800,000 Company shares.

85.    Spending $102.2 million on these repurchases in just two quarters was highly unusual.  In fact, for the entire fiscal year 2014, comScore had repurchased only $38.4 million worth of its stock.  Moreover, the average price paid for the shares repurchased by comScore in the second and third quarters of 2015 was $53.77 and $55.78, respectively.  Notably, these figures were just below the price thresholds for triggering the final two tiers of Defendant Matta and Wesley's performance-based restricted stock unit compensation packages, and clearly helped push the share price into the range necessary for them to receive this extra compensation.

86.    As was also later reported by the *WSJ*, each of the relevant 30-day periods in which comScore's stock reached the required average daily closing price included or closely followed one of comScore's earnings reports that reported strong revenue growth, which, in turn, facilitated the market's positive reaction, illustrated by comScore's rising stock price:



**D.    Rather than Disclose the Truth, to the Detriment of the Company and the Market, the Insider Selling Defendants Traded on Material, Non-Public Information**

87.    As previously mentioned, at various points during the Relevant Period, the Insider Selling Defendants—***including three current members of the Board***—used their knowledge of the Company's material, non-public information to sell personal holdings, while comScore's stock was artificially inflated following the release of the false and misleading statements the Individual Defendants caused the Company to issue as described herein.

88.    As officers and directors of comScore, the Insider Selling Defendants were privy to material, non-public information about the Company's true financial health—information that would, and did, impact investors' decision-making process with respect to determining the quality of comScore as an investment.

89.    While the Company's stock price was artificially inflated, Defendants Fulgoni, Matta, Abraham, Wesley, Tarpey, Henderson, and Korn—with knowledge that the Company's financial statements, press releases, and investor conference call presentations, among other public communications were false and misstated—***sold more than $78.3 million*** worth of Company stock in order to line their pockets at the expense of the Company and unwitting investors who bought the stock of what they thought was a growing business.

90.    Defendant Abraham's insider sales resulted in the largest illegal windfall.  After selling approximately 881,557 shares of his personally held comScore stock, Defendant Abraham received proceeds in excess of $29.86 million between September 2013 and May 2015.

91.    The table below summarizes the Insider Selling Defendants' stock sales during the Relevant Period.  Importantly, each of the Insider Selling Defendants timed their trades to

maximize profit from the Individual Defendants' issuance of the false and misleading statements regarding the Company's revenue and revenue growth, as alleged herein:

| Insider Seller | Total Shares Unloaded | Total Proceeds Received |
|---|---|---|
| Defendant Abraham | 881,557 | $29,863,956 |
| Defendant Fulgoni | 796,422 | $29,065,078 |
| Defendant Matta | 230,647 | $10,584,262 |
| Defendant Wesley | 119,644 | $6,188,259 |
| Defendant Henderson | 35,654 | $1,441,920 |
| Defendant Tarpey | 39,500 | $1,016,970 |
| Defendant Korn | 4,000 | $205,800 |
| **Total:** | **2,107,424** | **$78,366,245** |

### E.    The Truth About the Company's Reported Revenues Began to Emerge Only After the Insider Selling Defendants Cashed-In

92.    On November 25, 2015, the SEC issued a comment letter to comScore questioning certain disclosures made in the Company's annual financial report for fiscal year 2014, representing the period ended December 31, 2014.  The SEC first noted that comScore "state[d] that of $16.3 million in revenue related to non-monetary transactions during 2014, $10.7 million of that amount [was] attributable to a single related party transaction," and that the SEC was "unable to locate disclosure regarding these transactions in [comScore's] related party transactions disclosure included in [its] amended 10-K filed on April 24, 2015."

93.    Then, the SEC requested that management:

Tell us what considerations you gave to breaking out the impact of non-monetary transactions in your presentation of results of operations for the periods presented.

*        *        *

We note from your disclosures that you have non-monetary transactions. Describe the nature of the date exchanges that are being accounted for as non-monetary transactions.  Indicate whether these transactions are similar to your typical revenues transactions.  Consider revising your disclosures to clarify the nature of the non-monetary transactions.  We refer you to ASC 845-10-50-1.

94.     On December 3, 2015, the Individual Defendants caused the Company to respond to the SEC's letter.   In the Company's response, specifically with respect to the SEC initial inquiry regarding related party transaction disclosures, the Individual Defendants revealed that one of comScore's directors was affiliated with the counterparty representing the bulk of the nonmonetary transactions, but, as shown below, refused to publicly disclose the name of that director, the entity he was affiliated with, or even the specifics concerning the transactions:

> The Company supplementally advises the Staff that such disclosure relates to a contract by and between the Company and [****] (the "Customer"). [****] is a director of the Company and also a director of the Customer (the "Related Person"), which would make him a "related person" under Instruction 1 to Item 404(a). However, the Related Person did not and is not expected to have a material direct or indirect interest in the Company's transaction with the Customer. As of [****], 205, the Related Person beneficially owned only [****] shares of the Customer, or [****]% of its outstanding shares. During the fiscal year ended March 31, 2015, the Related Person earned $[****] in total compensation from the Customer for services as a member of its board of directors, all consistent with the disclosed director compensation policies of the Customer. The Related Person did not disclose any interest by the Related Person in the Customer to the Company, nor is the Company aware of further interest by the Related Person in the Customer or the referenced transaction with the Customer. Accordingly, the Company respectfully submits that the Related Person did not have a direct material interest in the referenced transaction, and in reliance upon Instruction 6 to Item 404(a), the Related Person did not have an indirect material interest in the referenced transaction since such person's only relationship arose as a director for the Customer and beneficial owner of less than 10% of the equity interest in the Customer.

95.     The Individual Defendants also argued to the SEC that the nonmonetary transactions were too "immaterial" to disclose them prior to the report filed by the Company for the quarter ended June 30, 2015:

> The Company supplementally advises the Staff that it considered the impact of its nonmonetary transactions during the year ended December 31, 2014 and *concluded that such transactions were immaterial to an understanding of the Company's operations as a whole during the period presented in the discussion of Results of Operations presented in the 2014 Form 10-K*. The Company advises the Staff that the revenue from such transactions represented less than 5% of total revenue during the year ended December 31, 2014. Notwithstanding, the

Company disclosed the overall effect in its Summary of Significant Accounting Policies in the discussion of its policy regarding nonmonetary transactions. *The Company supplementally advises the Staff that it first began disclosing the amount of its nonmonetary revenue and associated expenses in the discussion of its Results of Operations in its Quarterly Report on Form 10-Q for the quarter ended June 30, 2015. This disclosure was prompted when the Company's nonmonetary revenue exceeded 10% of its total revenue for the first time in a given period and the Company determined such detail may enhance a reader's understanding of its results of operations.* Accordingly, the Company increased the prominence of the disclosure.  However, the overall details were generally consistent with prior disclosures since the Company had historically broken out nonmonetary transactions in the notes to its financial statements and the summary of significant accounting policies included in its Managements' Discussion and Analysis of Financial Condition and Results of Operations section.

The Company will continue to carefully evaluate on a quarterly basis if additional disclosure regarding the extent and nature of its nonmonetary transactions should be described in the Results of Operations section or otherwise in its quarterly and annual reports.

*The Company supplementally advises the Staff that all of its nonmonetary transactions were consistent with its typical forms of transactions with data source providers for which costs are recognized and customer transactions for which revenue is recognized. Accordingly, the Company determined that the disclosure in the Results of Operations regarding trends generally otherwise captured the material factors contributing to the changes in the Company's results of operations for the periods presented in the 2014 Form 10-K.*

*All of the Company's nonmonetary transactions were consistent with its typical forms of transactions with data source providers for which costs are recognized and customer transactions for which revenue is recognized.*  As an example, in these types of nonmonetary transactions, the Company provides subscription products and solutions that it typically sells on a cash basis to data source providers in exchange for additional consumer demographics and segmentation data that improves the accuracy and granularity of the Company's products and services, particularly the Company's panel and census data.  *The Company concluded that such transactions were consistent with its accounting policies and with the terms of similar transactions with other ordinary course transactions but for the nonmonetary element.*  Notwithstanding, the Company intends to provide additional disclosure in its upcoming Annual Report on Form 10-K for the year ended December 31, 2015 consistent with the Staff's comment affirmatively clarifying the nature of these transactions and that such transactions

were conducted on terms otherwise consistent with its typical types of agreements
of similar substance.

The letter was signed by comScore's outside counsel with Defendants Matta and Wesley copied.

96.     Then, seemingly out of the blue, on February 19, 2016, following yet another announcement of "record" annual GAAP revenue—this time $368.8 million for fiscal year 2015—the Individual Defendants caused comScore to announce that the Board's Audit Committee had initiated an investigation in response to tips concerning possible accounting problems at the Company.  As a result, the Individual Defendants stated that comScore was not going to be able to timely file its 2015 annual report with the SEC.

97.     Incredibly, the Individual Defendants delayed filing the 2015 annual report in March, May, and June of 2016, despite being notified by the NASDAQ in March that it was not in compliance with its listing agreement and that comScore common stock would be delisted unless its 2015 annual report was filed within 60 days.

98.     On July 22, 2016, the Individual Defendants caused the Company to announce not that it was ready to file its 2015 annual report, but that, immediately and without explanation, co-founder, Defendant Abraham, was stepping down as Chairman of the Board to "focus on other things."

99.     The Individual Defendants again delayed the Company's filing of its 2015 Annual Report in August 2016, this time, however, disclosing that they had hired outside counsel and auditing professionals to assist the Audit Committee with its investigation.  The Individual Defendants revealed that the Board had identified some misreporting of nonmonetary revenue – primarily related to data-sharing agreements.  Additionally, the Individual Defendants advised that: (i) the Company's release of its interim financial statements for the first and second quarter of 2016 was, likewise, still delayed; (ii) co-founder Defendant Fulgoni was to replace then-CEO,

Defendant Matta as CEO; (iii) then-Executive Vice Chairman of the Board, Defendant Livek, would assume responsibilities for the Company's strategic and day-to-day operations; and (iv) Defendant Wesley was replaced as CFO by Defendant Chemerow in August 2016.

100.   Despite ample time to meet NASDAQ's reporting requirements, the Company continued to delay filings, and on September 2, 2016, the Individual Defendants announced that NASDAQ sent a delisting notice, citing comScore's inability to bring its SEC filings current.

101.   Then, on September 15, 2016, the Individual Defendants caused the Company to file a Form 8-K announcing the partial results of the Audit Committee investigation.  As it turned out, all of comSCore's previously-issued financial statements for fiscal years 2013 and 2014, along with the first three interim reporting periods of fiscal 2015 and the FY 2015 financial results, were no longer to be relied upon, requiring all prior financial statements to be restated. The root cause purportedly was the erroneous recognition of revenue from nonmonetary transactions that should never have been recognized in violation of GAAP.  More specifically, it was revealed that, in order to correct the "errors" in its accounting for nonmonetary transactions, the Company would wipe out *all of the previously recognized nonmonetary revenue*.   In relevant part:

> [T]he Company has concluded that revenue and expenses associated with all nonmonetary transactions during the periods identified above should be reversed and accounted for at historical cost rather than at fair value.  *There is no historical cost basis associated with the assets* that the Company exchanged and therefore *there should be no revenue recognized or expenses incurred for those transactions*.

(Emphasis added).

102.   Contrary to their previous assertions, the Individual Defendants admitted that they lacked a reliable basis to determine the fair value of the assets related to the nonmonetary transactions because neither the Company nor the counterparties to those transactions had made

comparable cash sales previously.   Moreover, they admitted that the nonmonetary transactions lacked commercial substance because the data comScore acquired was less valuable than they had previously represented, and that comScore did not have a historical cost basis for the data it delivered to counterparties in the nonmonetary transactions.

103.    Accordingly, the ***entire $43 million*** in nonmonetary revenue the Individual Defendants caused the Company to report during the Relevant Period, had been, and always was, recognized in complete violation of GAAP.

104.    These admissions played havoc on the Company's financials, as demonstrated by the table below, and left investors and analysts completely stunned.

| REPORTING PERIOD | REVENUES | | (LOSS) INCOME FROM | |
| --- | --- | --- | --- | --- |
| | AS PREVIOUSLY | AS ADJUSTED | AS PREVIOUSLY | AS ADJUSTED |
| FY December 31, 2013 | $286.86 Million | $283.615 Million | $3.093 Million | $1.644 Million |
| FY December 31, 2014 | $329.151 Million | $312.9 Million | ($14.78 Million) | **($14.768 Million)** |
| March 31, 2015 | $87.329 Million | $83.532 Million | ($9.19 Million) | **($8.816 Million)** |
| June 30, 2015 | $91.414 Million | $80.649 Million | ($2.818 Million) | **($8.593 Million)** |
| September 30, 2015 | $92.405 Million | $83.310 Million | $2.243 Million | **($1.722 Million)** |
| 3 Mos. December 31, 2015 | $97.669 Million | $92.362 Million | $7.115 Million | $8.332 Million |
| FY December 31, 2016 | $368.817 Million | $339.853 Million | ($2.650 Million) | **($10.799 Million)** |

105.    In the weeks that followed, the Individual Defendants caused the Company to make additional announcements concerning the Board and former executives.  On November 17, 2016, despite recently being appointed as Chairman, Defendant Lewis, along with fellow Board member Defendant Gottesman, suddenly and abruptly resigned with no explanation given as to why.   Then, on November 18, 2016, Defendant Henderson was appointed Chairman of the Board.  It was also revealed that Defendant Matta, whose resignation had been classified as "for good reason," guaranteeing him lucrative severance benefits paid out by the Company, was slotted to receive his current annual salary of $496,000 for a period of 24 months following his separation, or $992,000 along with ongoing COBRA medical insurance payments and any vested

stock options and restricted stock units (including those that had been improperly vested). Similarly, Defendant Wesley was to receive his then-current annual salary of $334,400 for a period of 15 months following his separation, or $418,000, along with ongoing COBRA medial insurance payments and any vested stock options and restricted stock units (including those that had been improperly vested).

106.    The news continued to go from bad to worse.  Just days later, on November 23, 2016, the Individual Defendants caused comScore to announce that it had identified more improper accounting, this time to certain monetary transactions.  For the first time, it was revealed that "the accounting treatment for certain monetary transactions [would] need to be adjusted, principally relating to the timing of revenue recognition," and that "[o]ne of these transactions involved over-delivery of data that recurred in multiple periods, two others included potential undisclosed additional arrangements that required contemporaneous contracts to be accounted for as a single arrangement, and one related to partially delayed invoicing for delivered data inconsistent with the terms of the contract."

107.    It was then admitted that the "Audit Committee's investigation also identified concerns regarding internal control deficiencies, ***including concerns about tone at the top***; errors in judgment identified with respect to issues reviewed; information not having been provided to the Company's accounting group and its external auditors; and the sufficiency of public disclosures made by the Company about certain performance metrics."

108.    Nearly two weeks later, Defendant Abraham resigned from the Board effective immediately.

109.    At the start of 2017, NASDAQ threatened to permanently delist the Company's shares if the Individual Defendants did not make current the Company's SEC filings. By

February 6, 2017, the Individual Defendants caused the Company to update the market with respect to its inability to meet this deadline, causing comScore's stock to nosedive 21.9%.

110. *The Wall Street Journal* ("WSJ") published an article, in response, suggesting that the Company's inability to meet a deadline for overdue financial disclosures "***suggests problems run deeper than previously thought***." (Emphasis added). In relevant part, the *WSJ* reported:

> ***For a company entrusted with providing accurate data on internet audiences, comScore is having a remarkably difficult time accurately measuring itself.***
>
> The firm said Monday it faced possible delisting from Nasdaq because it couldn't file its overdue financial disclosures in time. ComScore said Sept. 15 it would restate financial results from 2013, 2014, 2015 after an internal investigation discovered problems with its accounting.
>
> The Company also hasn't submitted it annual securities filing for 2015 or any of its quarterly filings for 2016. Nasdaq had given it until Feb. 23 to complete the restatements. ComScore shares were down about 25% at midday.
>
> *            *            *
>
> ***The additional delay in filing the restatements suggests the problems run deeper than previously thought and may lead wary customers to look elsewhere for measurement data***.

111. Four days later, on February 10, 2017, comScore shares were delisted from NASDAQ and moved to over-the-counter trading.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

112. Plaintiff brings this action derivatively in the right and for the benefit of comScore to redress injuries suffered, and to be suffered, by comScore as a direct result of the Individual Defendants' breaches of fiduciary duties.

113. Plaintiff is a current shareholder of comScore and has continuously held comScore stock throughout the Relevant Period.

114. Plaintiff will adequately and fairly represent the interests of comScore and its shareholders in enforcing and prosecuting its rights.

115.    The foregoing facts, among others, gave rise to Plaintiff's reasonable suspicion that one or more Company fiduciaries may have breached their duties owed to the Company and/or engaged in other violations of law.

116.    The Board currently consists of the following seven directors: Defendants Henderson, Fulgoni, Livek, Engel, Fradin, Korn, and Rosenthal.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act.

**Demand is Futile as to Defendants Henderson, Fulgoni and Korn Due to Their Suspicious Stock Sales**

117.    Three out of seven current members of the Board are interested and/or face a substantial likelihood of liability in connection with their illicit insider stock sales discussed above.

118.    During the Relevant Period, suspiciously timed to occur after good news and before bad news about comScore was released to the market, Defendants Henderson, Fulgoni and Korn sold 35,654, 796,422, and 4,000 personally-held shares of comScore stock for proceeds in excess of $1.44 million, $29.06 million and $208,000, respectively.   In each instance, Defendants Henderson, Fulgoni and Korn executed these trades while in possession of material, adverse, non-public information, and during a time when comScore's stock was artificially inflated due to the Individual Defendants' false and misleading statements concerning the Company's revenue and revenue growth.

119.    As a result of these illicit sales, Defendants Henderson, Fulgoni and Korn received direct financial benefits not shared with comScore's stockholders, and are, therefore, directly interested in a demand.  Further, Defendants Henderson, Fulgoni and Korn are interested

in a demand because they face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith arising from their illicit insider sales.

**Demand is Futile as to Defendants Henderson and Katz Due to Their Granting of Performance-based Stock Options**

120.    During the Relevant Period, Defendants Henderson and Katz served as members of the Board's Compensation Committee and were responsible for approving and evaluating the executive officer and non-executive level employee compensation plans, policies and programs of the Company, and for administering the Company's equity compensation plans.

121.    Defendants Henderson and Katz, while aware that the Company's reported revenues were fictitious and that comScore's stock was trading at artificially inflated prices, nonetheless granted Defendants Matta and Wesley awards of stock options and restricted stock units, fully vesting and exercisable when the average daily closing price of the Company's common stock exceeded pre-determined thresholds during any 30 consecutive calendar-day period.

122.    Thus, Defendants Henderson and Katz face a substantial likelihood of liability and issuing a demand upon them would be a futile, wasteful and useless act.

**The Board has Concluded in its Business Judgment that Defendant Fulgoni is Not Independent, and for Similar Reasons, Neither is Defendant Livek**

123.    The principal professional occupation of Defendant Fulgoni is his employment with comScore as its Co-Founder and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  In addition, according to the Company's June 2015 Proxy Statement (the "2015 Proxy"), the Board has admitted that Defendant Fulgoni is not independent under the NASDAQ listing standards, which defines an independent director to be a person that the Board of Directors determines to be free of any

relationship with comScore that, in the opinion of the Board, would interfere with the exercise of such person's independent judgment in carrying out the responsibilities of a director, and to meet the then-current objective standards for "director independence" set forth in the listing standards. Thus, Defendant Fulgoni lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

124.    Likewise, Rentrak's last annual proxy statement to its shareholders expressly conceded that Defendant Livek was not independent due to his executive positions with Rentrak and his relationships with and dependence upon its board members for his livelihood. For the same reasons, though Defendant Livek was not yet on comScore's Board when its 2015 Proxy was issued---and even though the Company has not yet held a 2016 annual general shareholder meeting much less mailed out a Proxy statement for 2016---defendant Livek equally lacks independence.

125.    Both the comScore and Rentrak boards, which at present exist as one, likely did not lightly classify Defendants Fulgoni and Livek as not independent.  Their respective relationships, in the opinion of these boards, would evidently interfere with the exercise of independent judgment in carrying out the responsibilities of a director, rendering them incapable of impartially considering a demand to commence and vigorously prosecute this action.

126.    Thus, there is reason to doubt that Defendants Fulgoni and Livek are independent and issuing a demand on them would be a futile, wasteful and useless act.

**The Director Defendants Face a Substantial Likelihood of Liability for Their Misconduct**

127.    The Director Defendants owed comScore the highest duty of loyalty and breached that duty by recklessly permitting, and in some cases directly contributing to, the Company's

issuance of false and misleading statements concerning comScore's fictitious growth. Accordingly, the Director Defendants each face a substantial likelihood of liability.

128.    During various times of the Relevant Period, Defendants Henderson, Korn, Lewis and Rosenthal served as members of the Audit Committee. Pursuant to the Audit Committee Charter, all members of the Audit Committee were and are responsible for, *inter alia*: (i) reviewing on a continuing basis the adequacy of the Company's system of internal controls; (ii) reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements; (iii) reviewing before release the unaudited quarterly operating results in the Company's quarterly earnings release; and (iv) reviewing and approving in advance any proposed related party transactions.

129.    Defendants Henderson, Korn, Lewis and Rosenthal breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures. Therefore, Defendants Henderson, Korn, Lewis and Rosenthal each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

130.    Each of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of their causing the Company to conceal the truth about its financial condition, rendering them unable to impartially investigate the charges and decide whether to pursue action against themselves on behalf of the Company.

131.    The Director Defendants, as members of the Board, were and remain subject to the Ethics Code, which warns, "***You may not intentionally misrepresent the company's financial performance or otherwise intentionally compromise the integrity of the company's***

*reports, records, policies and procedures."* Moreover, the Ethics Code emphasizes the importance of, and need for, comScore employees, officer and directors to use all reasonable efforts to provide complete, fair, accurate, objective, relevant, timely and understandable information to the public.  The Director Defendants violated the Ethics Code by concealing the truth, which artificially inflated the Company's stock, causing and/or facilitating the insider sales. Because the directors violated the Ethics Code, they face a substantial likelihood of liability for their breaches of fiduciary duties.

132.    Thus, for the reasons set forth above, all of the Director Defendants, and, if not all of them, certainly the majority of the directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile and this stockholders derivative action should be allowed to proceed.

### COUNT I

### Against the Individual Defendants for
### <u>Violations of §10(b) and Rule 10b-5 of the Exchange Act</u>

133.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134.    Throughout the Relevant Period, the Individual Defendants, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications, and a national securities exchange, employed a device, scheme, or artifice to defraud, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company and shareholders in connection with their purchases of comScore

stock during the Relevant Period, all in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

135.    The Individual Defendants, as the most senior officers and/or members of the Board of comScore and various committees of the Board during the Relevant Period, are liable as direct participants in all of the wrongs complained of herein.  Through their positions of control and authority, the Individual Defendants were in a position to and did control all of the false and misleading statements and omissions made on behalf of the Company, including the contents of all its public filings and reports and press releases, as more particularly set forth above.

136.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them and they had express responsibility for knowing such facts.  Such material misrepresentations and omissions were made knowingly or recklessly and for the purpose and effect of concealing the Company's true financial and operating condition from shareholders and supporting an artificially inflated price of the Company's common stock.

137.    The Individual Defendants acted with scienter throughout the Relevant Period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  Specifically, under GAAP, a "restatement" is a term of art used only where a company's previously issued financial statements  were materially false as of the time of issuance and the misstatements were based on "facts that existed at the time the financial statements were prepared."  In this case, comScore

has announced that it will be issuing a broad restatement because "the Company cannot support the prior accounting for the nonmonetary transactions recorded by the Company during the years ended December 31, 2013, 2014, and 2015." The Company's Audit Committee has determined that comScore's "revenue and expenses associated with ***all nonmonetary transactions*** during the periods identified above should be reversed and accounted for at historical cost rather than at fair value." (Emphasis added). comScore has since identified additional monetary transactions that were improperly accounted for where revenue was improperly recognized. As revealed on November 23, 2016, the Audit Committee's investigation expressly, "identified concerns regarding internal control deficiencies, ***including concerns about tone at the top***…" (Emphasis added). The Officer Defendants were among the senior management of the Company, and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

138.    The Officer Defendants signed certifications to various Forms 10-Q and 10-K filed publicly with the SEC during the Relevant Period, attesting that they had reviewed the reports and based on their knowledge, there were no untrue statements of material fact or omissions of material fact necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading.

139.    Accordingly, the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they:

      a.  employed devices, schemes and artifices to defraud;

      b.  made untrue statements of material facts or omitted to sate material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c.   engaged in acts, practices and a course of business that operated as a fraud or deceit upon comScore and others in connection with their purchases of comScore common stock during the Relevant Period.

140.    As a result of the Individual Defendants' misconduct, comScore has suffered and will suffer damages.

141.    Plaintiff, on behalf of comScore, has no adequate remedy at law.

**COUNT II**

**<u>Violations of §20(a) of the Exchange Act Against the Officer Defendants</u>**

142.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

143.    The Officer Defendants, by virtue of their positions within comScore and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of comScore within the meaning of §20(a) of the Exchange Act.  They had the power and influence and exercised the same to cause comScore to engage in the illegal conduct and practices complained of herein.

**COUNT III**

**Against the Individual Defendants for Breach of Fiduciary Duties for**
**<u>Disseminating False and Misleading Information</u>**

144.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.    As alleged in detail herein, each of the Individual Defendants violated and breached their fiduciary duties of loyalty and good faith by causing or allowing the Company to disseminate to comScore shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls and other public statements and

45

disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

146.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages. Thus, as a result of the misconduct alleged herein, the Individual Defendants are liable to the Company

## COUNT IV

### Against the Individual Defendants for Breach of Fiduciary Duties for <u>Failing to Maintain Internal Controls</u>

147.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

149.    The Individual Defendants, most notably those serving on the Board's Audit Committee, willfully ignored the known and pervasive problems with comScore's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

150.    As a direct and proximate result of the Individual Defendants foregoing breaches of fiduciary duties, the Company has suffered significant damages. Thus, as a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT V

### Against the Individual Defendants for Unjust Enrichment

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of comScore.

153.    Plaintiff, as a shareholder and representative of comScore, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

## COUNT VI

### Against the Insider Selling Defendants For Breach of Fiduciary Duties For Insider Selling and Concealing Material Information

154.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

155.    At the time of each of the stock sales set forth above, the Insider Selling Defendants knew, but did not disclose publicly, that the Company's financials were not accurate, due in part to improper accounting of data-sharing agreements with other companies that had no cash attached, making the Company's reported growth false . The Insider Selling Defendants, in complete disregard of the Company's Ethics Code, made each of the stock sales described herein on the basis of and because of their knowledge of the material, non-public information described herein.

156.    Further, at the time of their stock sales, the Insider Selling Defendants knew that when the Company's lackluster financials were finally reported, the price of the Company's

common stock would dramatically decrease. The Insider Selling Defendants' sale of comScore common stock based on their knowledge of this material non-public information was a breach of their fiduciary duties of loyalty and good faith.

157.    Accordingly, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

158.    Plaintiff, on behalf of comScore, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of comScore and that Plaintiff is a proper and adequate representative of the Company;

B.    Against Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

C.    Directing comScore to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable law and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

D.    Awarding to comScore restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  February 17, 2017                    */s/ Joseph R. Seidman, Jr.*            

**BERNSTEIN LIEBHARD LLP**
Joseph R. Seidman, Jr.
10 East 40th Street
New York, NY 10016
Tel:   (212) 779-1414
Fax:  (212) 779-3218

**THE WEISER LAW FIRM, P.C.**
ROBERT B. WEISER
BRETT D. STECKER
JAMES M. FICARO
JONATHAN M. ZIMMERMAN
22 Cassatt Avenue
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062

Counsel for Plaintiff Michael C. Donatello

## COMSCORE, INC. VERIFICATION

I, Michael C. Donatello, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 16 FEB 2017                    _____

                                     Michael C. Donatello